Filed 10/3/16  In re L.Y. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re L.Y., a Person Coming Under the Juvenile Court Law. | B269221 |
| | (Los Angeles County Super. Ct. No. CK90165) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| Y.Y., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Terry Truong, Juvenile Court Referee.  Affirmed.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel for Plaintiff and Respondent.

Y.Y. (mother) appeals from a judgment assuming jurisdiction over her daughter, L.Y. (child) (born July 2009). Mother challenges the juvenile court's decision that jurisdiction was warranted under Welfare & Institutions Code section 300, subdivisions (b) and (d).[1] Mother also challenges the juvenile court's dispositional order removing the child from her care.

We affirm the judgment.

## COMBINED STATEMENT OF FACTS AND PROCEDURAL HISTORY

**Investigation**

On March 15, 2015, the Department of Children and Family Services (DCFS) received a referral alleging that mother allowed her child to live in the same residence as a registered sex offender, Ronald D., and among people who appeared to be drug users. Despite numerous visits to the home, messages left, and business cards left at the door, the social worker received no response from mother.

On April 21, 2015, DCFS received a referral alleging caretaker absence/incapacity. Mother was involved in a dispute and was arrested. There was no caretaker present to care for the child. Law enforcement detained the child and brought her to the DCFS office.

Law enforcement reported that mother and her roommate, Nadia D., were in the process of moving out. Nadia D. invited a friend over to fix the bathrooms in the home which were not working. Mother walked into the bathroom and found Nadia D.'s friend there. Mother told him to leave the home and sprayed mace in his face. Nadia D. contacted law enforcement. When the police arrived to arrest mother, she was uncooperative.

When a social worker spoke with Ronald on April 22, 2015, he said someone from the police station called him to retrieve the child, but when he got to the station he was unable to reach anyone. Ronald acknowledged that he and mother knew that the social worker had been trying to contact them, but mother felt she did not have to respond

---

[1] All further statutory references are to the Welfare & Institutions Code unless otherwise noted.

2

because she had a bad history with previous social workers. Ronald was not the child's biological parent, but stated he was like her parent because he had lived with mother and helped raise the child for two years. Ronald said he was a registered sex offender for something he did when he was 18. He denied having sexually abused the child. He informed the social worker that he and mother used marijuana on a daily basis to treat back pain.

DCFS was unable to interview mother due to her incarceration. DCFS obtained Ronald's profile from the Megan's Law database and found he was previously convicted of violating Penal Code section 647.6, which prohibits annoying or molesting any child under 18 years of age. (Pen. Code, § 647.6, subd. (a)(1).)

**Section 300 petition and detention hearing**

On April 24, 2015, DCFS filed a petition on behalf of the child pursuant to section 300, alleging that mother engaged in a violent altercation with an unrelated adult male in the child's home, sprayed pepper spray in the man's face, and was arrested.

The petition further alleged that on prior occasions for a period of two years, mother established a detrimental and endangering home environment when she allowed the child to reside with an unrelated adult male, Ronald D., who mother knew or reasonably should have known was a registered sex offender. The petition alleged that this detrimental home environment endangered the child's physical health and safety and placed her at risk of harm.

A detention hearing took place on April 24, 2015. The juvenile court found that Y.J. is the child's alleged father.[2] Over mother's objection, the juvenile court found that DCFS had established a prima facie case and detained the child. Mother was permitted monitored visits at least two times per week for two hours or as often as could be arranged.

---

[2]     Y.J. is not a party to this appeal.

3

**Prior child welfare history**

The family had a prior child welfare history in both Georgia and Los Angeles County. The case in Georgia was initiated due to mother testing positive for marijuana at the time of the child's birth. Mother admitted to drinking cannabis tea to treat back pain and participated in voluntary services. Mother received a drug assessment and screening as part of the case. It was reportedly determined that mother was not dependent on marijuana, but had a "tendency towards narcissistic personality and that counseling would only give [her] a richer vocabulary." The assessor did not believe this would affect mother's ability to parent.

On December 8, 2011, DCFS filed a section 300 petition on behalf of the child after it was reported that mother left the child unattended while she slept all day and the child had been found roaming the shelter where mother and child were staying. The child was reportedly found walking outdoors although the surrounding area was very dangerous. The petition was dismissed without prejudice and mother was provided with voluntary family maintenance services.

DCFS received a referral in June 2013 that mother, who was receiving services from a homeless agency, was under the influence and that her motel room smelled of marijuana. The referral was substantiated but the matter was closed due to loss of contact with the child. The family was homeless and mother's whereabouts were unknown.

A May 2013 referral alleged that mother and her landlord's son were involved in an argument and the landlord's son hit the child in the head with a laundry basket. The referral was closed because the perpetrator was an unrelated male and not a caregiver.

On August 29, 2012, it was reported that while mother was at the Department of Public Social Services making telephone calls to homeless shelters, the child became cranky and mother put her hand over the child's nose and mouth. The child struggled to get away. Mother was asked what she was doing, and mother responded that she always does that and it is the only way to get the child to stop crying. Mother's behavior was disconcerting and the reporting party thought mother might have some undiagnosed

mental health issues. The matter was concluded as inconclusive as the family was homeless and DCFS lost contact with them.

On January 17, 2014, it was reported that mother was at the Los Angeles Homeless Agency with the child and started using inappropriate language with the child in the bathroom. Mother was well known at the agency and did not stay in the shelters provided. Mother would not accept Calworks so the workers had to call it something else. The allegations were substantiated as to general neglect, as mother had not provided a stable home for the child, had unmet mental health needs, used marijuana and had a history of leaving the child unsupervised. Mother did not make herself available to DCFS for investigation.

**Jurisdiction/disposition report**

On May 11, 2015, DCFS filed a jurisdiction/disposition report. The social worker found no evidence that the child had been abused or mistreated. Due to her age, the child was unable to provide clear answers during an interview. She denied being mistreated, but did not specifically answer whether she had ever been touched in a bad way. The child informed the social worker that Ronald was no longer living with them. She preferred to play and answered no more questions.

Mother denied that she was squatting in the home where the family was residing, although she had been served with eviction papers. Police officers had been called to the home 10 times regarding various disputes. The social worker spoke with an individual who was identified as the homeowner's agent, who said that mother and Ronald were squatters. He denied that they paid rent and was adamant that they should not be there.

Ronald was interviewed. He confirmed that he had moved because he was tired of the problems with the landlord. Ronald stated that he and mother had a contract to work and manage the home in lieu of rent. He denied that drug users came in and out of the home but confirmed that he and mother use marijuana for back pain. He denied domestic violence, and added that when he and mother had communication problems they sent the child to her room. Ronald admitted being a registered sex offender. He claimed to have

5

made a mistake when he was 18 years old for which he should not be judged. Ronald denied having sexually abused the child.

Mother was also interviewed. She denied the child was neglected or sexually abused. Mother stated that Ronald kissed a teenage girl when he was 18 years old. Mother reported that she used marijuana for medicinal purposes. She denied engaging in domestic violence or loud arguments with Ronald. With respect to her April 21, 2015 arrest mother said that an intruder walked into the bathroom while she was urinating. Mother said the police arrested her because they did not want her to record the incident.

The child was interviewed in foster care on May 6, 2015. When asked about the altercation between mother and the unrelated male, the child indicated that the male was Nadia's friend. He tried to fix the door because mother broke it. Mother told him to get out of the house and sprayed him with mace.

The child did not know anything about Ronald being a sex offender. She denied any inappropriate behavior by Ronald. When asked whether mother and Ronald engage in physical altercations, the child stated: "'[W]hen they get mad they hit each other. He hit her only one time and it left scratches on her tummy. He smokes cigarettes.'" The child did not know Y.J.

On May 5, 2015, the social worker attempted to set up a time to interview mother. Mother stated, "I'm not meeting with any DCFS employees because they have all dogged me in the past." Mother refused to meet with the social worker. Y.J.'s whereabouts were unknown and DCFS was unable to interview him.

The child had no known developmental delays and had been homeschooled by mother. The foster mother planned to enroll the child in kindergarten. The foster mother described the child as bright and articulate. The foster mother reported that mother was rude and belligerent with her on the telephone.

DCFS attached to the report an email from Nadia reporting that the room mother and the child slept in with Ronald was filthy. Pictures attached to the email included a blue vessel containing urine, and according to the email mother also left "bloody

6

menstruation napkins" all over the place. The email reported that the place was filthy and unsuitable for a child.

**June 12, 2015 last minute information for the court and hearing**

A last minute information for the court was filed on June 12, 2015. The social worker had interviewed mother on May 12, 2015. Mother referred to Ronald as her husband although they were not married. Mother had been in a relationship with Ronald for two years. Mother reported that she and Ronald worked as property managers for vacation properties in Long Beach. They were compensated with room and board.

Mother confirmed that she was charged with assault for spraying an individual with pepper spray. The next court date was May 28, 2015. Mother stated that she and Ronald had been out of town from April 13 through 21, 2015. On April 21, 2015, she and the child were home and Ronald was still out of town. Mother said one of the tenants in the back had a male friend who needed to make some repairs. Mother was urinating in the toilet and the door was locked, but the male came into the bathroom. He had a two-by-four plank and he kept looking at her. Mother said she pepper sprayed him, ran out with her daughter and called 911. Mother said the man refused to identify himself. When the police officers arrived, mother refused to stop recording them which was why they arrested her.

DCFS provided the court with the docket relating to mother's case, which documented that she was charged with a violation of Penal Code section 22810, subdivision (g)(1), which addresses the use of tear gas or a tear gas weapon "except in self-defense."

With respect to Ronald's status as a registered sex offender, mother stated that Ronald kissed a 14-year-old girl when he was 18. She admitted that her daughter slept with them. If she had a nightmare, the child would come to bed with them.

Mother had a physician's statement and recommendation that she use medical marijuana for medicinal purposes. The issuance date was March 10, 2015, with an expiration date of March 9, 2016.

7

On June 12, 2015, county counsel filed a notice of intent to rely on section 355.1, subdivision (d).  Minor's counsel told the juvenile court that the child referred to Ronald as her father.  The child wanted to visit with Ronald.  Over DCFS's objection, the juvenile court ordered that Ronald could have monitored visits with the child at the DCFS office.

The matter was continued for adjudication.

**July 1, 2015 interim review report**

DCFS filed an interim review report with the juvenile court on July 1, 2015. DCFS reported that mother had telephoned a social worker from Aspira Foster and Family Services.  Mother was very angry and directed foul language at the social worker in a persistently elevated voice.  Mother made allegations against the child's foster mother, stating that she used bows in her hair and made her drink milk.  Mother appeared to believe that people were conspiring against her.  Mother had to be directed repeatedly to use appropriate language during the conversation, which lasted approximately an hour. During the call, mother would start and stop crying suddenly.  Mother could also be heard banging objects when she raised her voice.

DCFS also received information that Ronald had an arrest in 2014 for loitering where children were present.  It also appeared he had an outstanding arrest warrant.

Mother continued to refuse to participate in counseling, saying she would not do anything DCFS asked of her, and she refused to disclose her new address.  Mother told the child during a visit that "evil and wicked souls" were "keeping [them] apart" and had to be reprimanded about making inappropriate statements during the visit.

On June 23, 2015, the social worker spoke with the property managers at mother's former residence, Dean G. and Deandra F.  Dean G. was worried about mother's mental condition because she had written him several irrational notes.  Dean G. said mother and Ronald were living in the attic for about six months and did not pay rent.  They had been invited to live there by a tenant who was subsequently evicted.  Dean G. said the child slept with mother and Ronald and referenced Ronald's status as a registered sex offender.

Dean G. stated that mother called the police 42 times because she was angry they were trying to evict her and each time the report was deemed unfounded.

Dean G. said mother disciplined the child by making her stand in a corner for 20 minutes three times per day. He said the child was rarely permitted to go outside and that when the couple wanted alone time, they would lock the child in the bathroom for hours while she screamed "mommy, mommy."

In a June 24, 2015 email Dean G. expressed his concerns regarding mother. He identified himself as the property manager for the property where mother, the child, and Ronald were living and indicated that they had been unlawfully occupying the property. He stated that he and Deanna F. had witnessed unusual and violent behavior by mother and Ronald towards each other and them. Dean G. also attached a log of law enforcement calls.

DCFS thought that the child was at risk of harm due to Ronald having an active warrant out for his arrest and mother's belief that it was not problematic for the child to sleep in the same bed with him. DCFS recommended that the juvenile court offer mother reunification services. DCFS was concerned that the mother would flee if the child were released to her.

**July 1, 2015 hearing**

The July 1, 2015 adjudication hearing was continued at the request of DCFS to enable them to obtain Ronald's criminal records from Maryland and records related to his recent arrest for loitering in the presence of children. DCFS's request to terminate Ronald's visits was denied. When the court asked mother to provide her address, she refused.

**August 24, 2015 interim review report**

DCFS filed an interim review report with the court on August 24, 2015. Ronald was reportedly at Las Casinas hospital due to a suicide attempt. Ronald reportedly tried to cut his deltoids with a serrated knife.

In addition, there had been a problem with mother's visit on July 1, 2015. Mother took pictures of the child's braided hair to show the court. Mother was also upset that the

child had been vaccinated.  Mother asked DCFS if she could sue the foster mother because she was abusing her child.  Mother caused a scene and the foster mother had to terminate the visit.  As the foster mother was leaving, mother grabbed the child's arm.  The foster mother was no longer willing to monitor mother's visits.

When the social worker met with the child on July 7, 2015, the child said school was fine but she did not like her telephone calls with mother.  The child stated, "I don't like her, she's annoying."  When the social worker asked why, the child stated "She asks a lot of questions and I just want to play."

A March 14, 2014 police report documented that Ronald was arrested that date for loitering in a place where children congregate in violation of Penal Code section 653b.  A police officer responded to a complaint from the library alleging that Ronald yelled profanities after being asked to move his dog from the library entrance.  The responding officer found Ronald sitting at a table in the children's section of the library.  Ronald was sitting at a child-size table with two girls and a woman he identified as his girlfriend.[3]  Other children were present in the immediate area.  Because Ronald had left his dogs tied to a rail by the library entrance unattended, the officer began writing a citation.  When asked for his address, Ronald became agitated and said he was a transient when he last registered as a sex offender.  The officer arrested and booked Ronald for loitering in an area where children congregate and for a misdemeanor warrant from a previous incident.[4]

**Amended section 300 petition**

On August 24, 2015, DCFS filed a first-amended section 300 petition, adding a count alleging that mother demonstrated erratic, unstable, and paranoid behavior by exposing the child to multiple unsafe and unstable home environments and unsafe and inappropriate adults.  The added count further alleged that mother engaged in

---

[3]     The report does not indicate the identity of the woman Ronald identified as his girlfriend or the children.

[4]     The report does not identify the previous incident that led to the issuance of the warrant.

altercations, yelling matches, and fist fights with different adults while she had custody of the child and that mother's conduct put the child at risk of harm.

**Jurisdictional hearing**

At the August 24, 2015 jurisdictional hearing, the juvenile court admitted the DCFS reports into evidence.

Mother's counsel asked the court to dismiss the section 300 petition. Mother acknowledged that section 355.1 shifts the burden to mother to establish that Ronald's status as a registered sex offender did not put the child at risk. However, mother's counsel argued that there was no evidence that the child had been harmed, or was at risk of harm, due to Ronald's presence in the home.

Regarding the allegations that had just been filed, mother's counsel argued that moving to multiple locations was not a basis for jurisdiction. While the new allegations stated that mother engaged in altercations with adults, it was unclear who those adult were. Mother's counsel acknowledged that there was information in the record from Dean G. supporting the new allegations,[5] however, Dean G. could not be considered an unbiased, credible source of information.

Minor's counsel argued that DCFS had met its burden and that the child was at substantial risk of harm from mother's erratic behavior, allegations of abuse against the foster mother, and failure to cooperate with DCFS and the social worker. In addition, mother's disputes with the property manager, DCFS and the social worker showed a substantial risk of harm.

DCFS argued that the fight which was the basis for the first allegation in the petition was indicative of a "pattern that mother engages in inappropriate conflicts with other adults." That pattern could also be seen in the history of prior referrals. As to Ronald, minor's counsel argued that it was inappropriate for mother to cohabitate with him given his status and his criminal history.

---

[5] Mother's counsel refers to Dean G. as "Mr. Dean."

The juvenile court sustained counts b-2 (alleging that mother caused the child to reside with a registered sex offender); b-3 (alleging that mother has demonstrated erratic, unstable and paranoid behavior by exposing the child to multiple unsafe and unstable home environments and engaged in altercations with other adults); and d-1 (alleging that mother established a home environment which placed the child at risk of sexual abuse). The court dismissed the allegations regarding the incident where mother sprayed pepper spray in a man's face. The court noted that section 355.1 shifts the burden to mother to show that the child is not at risk due to Ronald's status as a registered sex offender. The court had no such evidence before it. The court found the child to be described by section 300, subdivisions (b) and (d), and continued the matter for disposition.

**September 23, 2015 last minute information for the court**

DCFS provided two last minute information sheets for the court on September 23, 2015. The social worker attempted to verify mother's address on September 18, 2015. The address mother provided was for a hotel. The social worker spoke with the hotel manager, who said that mother and Ronald would come and go from the hotel and had checked out several days before. The hotel manager said mother and Ronald acted inappropriately and were no longer permitted to reside there.

DCFS further reported that the social worker had to terminate early mother's visit with the child on September 2, 2015, because mother and Ronald had raised their voices in front of the child. Mother was upset that the child was wearing nail polish and said it violated her religious beliefs. The social worker said she would speak with the foster mother. Mother asked to speak with a supervisor. Ronald was making false allegations and both he and mother were yelling. The social worker informed them that this was not appropriate and that the visit would be terminated if they continued to yell. When the yelling continued along with allegations that the child was being abused, the social worker terminated the visit. On the way out, Ronald stared in a taunting way at the monitor. Ronald continued to yell when he was in the lobby. When the child began to walk out with the monitor, Ronald was yelling, "It's ok, Sunny, you be strong and don't let these evil people get you." The monitor also reported that during the visit, both

12

mother and Ronald repeatedly asked the child who put the nail polish on her. The child did not answer and asked to just visit. Ronald was no longer permitted to visit with the child due to his volatile and inappropriate behavior.

**September 23, 2015 hearing**

Though the case was on the September 23, 2015 calendar for disposition, the matter was continued for further ICWA notice, over mother's objection. Mother's counsel informed the court that mother was now residing in a homeless shelter and provided the court with an address.

**December 15, 2015 last minute information for the court**

On December 15, 2015, DCFS filed a last minute information for the court indicating that mother did not participate in any services saying she did not need services. Mother refused to accept referrals or transportation funds. Mother continued to visit with the child two times per week. Mother constantly questioned the child about what she was eating, what she played with, and what television shows she watched. The child appeared uncomfortable when mother questioned her and mother had to be redirected to focus on the visit.

The foster mother noticed that the child would act out after visits.

**Disposition hearing**

The juvenile court conducted the disposition hearing on December 15, 2015.

The parties stipulated that if mother called a witness by the name of Odara P., that witness would testify that she lived with mother and the child for approximately four to six months in 2011, that she is a teacher and a mandated reporter, that she has seen mother and the child at least once a year and that the visits were four to six hours in duration. Odara P. would further testify that "during the time she lived with mother and child and all the subsequent times she saw mother and child together, she never had any concerns and observed a close relationship between mother and child."

Mother testified at the hearing that she did not think the social worker had assisted her. Mother acknowledged leaving the child alone with Ronald, stating "He is her father." Mother did not believe the child was, or would ever be at risk of harm with

13

Ronald. Mother stated that DCFS had made false claims about her being erratic and mentally ill and getting into fistfights. Mother said she had never been involved in a fight or a fistfight in her life. When asked whether she intended to allow the child to have extended contact with Ronald if the child was released to her, mother responded, "He has petitioned to be her legal father. He has been her father for two years. She has not been harmed by him, regardless of this record."

Mother's counsel asked the court to release the child to mother's care, arguing that DCFS's disagreement with mother's parenting did not rise to a level of abuse or neglect necessitating removal of the child from mother's care. Mother's counsel also pointed out that DCFS was relying on statements from the landlord, against whom mother had a restraining order.

The child's counsel argued that mother was combative and aggressive, and disagreed with mother's counsel's assertion that this behavior had no impact on the child. The child's counsel pointed out that the child had urinated on herself after visits with mother and acted aggressively after seeing mother act aggressively. Minor's counsel also mentioned that mother permitted the child to sleep in the same bed with a registered sex offender; the child reported that she had seen mother and Ronald hit one another; there were concerns regarding possible drug use; mother was not enrolled in programs and refused to accept responsibility for the situation.

County counsel recommended suitable placement for the child. County counsel referenced mother's testimony that she and Ronald were still a couple and mother's behavior during her visits. In addition, county counsel pointed out that mother was not involved in any services.

The juvenile court declared the child a dependent of the court and removed her from mother's custody. While the court noted that previous petitions had been dismissed, it found mother's "behavior has escalated to a point that it is dangerous for [the child] to remain with her . . . ."

On December 15, 2015, mother filed her notice of appeal.

14

**DISCUSSION**

**I. The court did not err in applying section 355.1**

The juvenile court sustained counts b-2 and d-1, alleging that mother created a detrimental home environment by causing the child to live with an unrelated male who mother knew or should have known was a registered sex offender. In sustaining the allegations, the court noted that section 355.1 shifts the burden to the mother to show that the child is not at risk from Ronald's status as a registered sex offender. The court stated, "I do not have any evidence before me to show otherwise in this case."

Mother admits that Ronald was required to register as a sex offender. However, mother argues that the evidence does not support the juvenile court's determination that the child was at risk of harm due to Ronald's status as a registered sex offender. Mother explained to DCFS that Ronald's conviction involved kissing a 14-year-old when he was 18. Mother argues that DCFS did not provide evidence of the nature of Ronald's conviction in Maryland. More importantly, mother argues, there was no indication that the child was sexually abused. Both mother and the child denied abuse, and nothing in the child's conduct suggested sexual abuse.

*A. Applicable law and standard of review*

Section 300, subdivision (b), provides that a child is within the jurisdiction of the juvenile court if the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure or inability to adequately supervise or protect the child, or "the willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left." (§ 300, subd. (b)(1).)

Section 300, subdivision (d), provides that a child is within the jurisdiction of the juvenile court if "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian

15

knew or reasonably should have known that the child was in danger of sexual abuse." (§ 300, subd. (d).)

The juvenile court's job was to determine by a preponderance of the evidence whether the child was described by section 300.

Section 355.1, subdivision (d) states, in pertinent part:

> "Where the court finds that either a parent, a guardian, or any other person who resides with, or has the care of custody of, a minor who is currently the subject of the petition filed Section 300 . . . (2) has been previously convicted of an act in another state that would constitute sexual abuse as defined in Section 11165.1 of the Penal Code if committed in this state . . . (4) is required, as a result of the felony conviction, to register as a sex offender pursuant to Section 290 of the Penal Code, that finding shall be prima facie evidence in any proceeding that the subject minor is a person described by subdivision (a), (b), (c), or (d) of Section 300 and is at substantial risk of abuse or neglect. The prima facie evidence constitutes a presumption affecting the burden of producing evidence."

Thus, pursuant to section 355.1, subdivision (d), Ronald's status as a registered sex offender was prima facie evidence that the child was a person described by section 300, subdivisions (b) and (d).

In evaluating the factual findings of the juvenile court, we use the substantial evidence test. Under this standard, we review the whole record in a light most favorable to the findings and conclusions of the juvenile court. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426.) We do not reassess the credibility of the witnesses or reweigh the evidence. (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.) If substantial evidence exists, we must affirm the juvenile court's orders, whether the evidence is controverted or not. (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1020-1021.)

### B. *Mother failed to present sufficient evidence to rebut the presumption*

It was undisputed that Ronald was a registered sex offender and the presumption contained in section 355.1 was applicable.

In addition to the undisputed evidence that Ronald was a registered sex offender, DCFS provided evidence supporting its position that Ronald's presence in the home

placed the child at risk of harm and sexual abuse: that Ronald was convicted of a violation of Penal Code section 647.6, annoying or molesting a child under 18 years of age. In addition, there was evidence that Ronald was recently cited for loitering in an area where children were present. Furthermore, there was a warrant out for Ronald's arrest after he failed to appear pursuant to this citation.[6] Mother admitted that despite Ronald's criminal history, she allowed the child to sleep in bed with Ronald.

Mother relies on *In re Quentin H.* (2014) 230 Cal.App.4th 608 (*Quentin*). *Quentin* involved a father who had a 1987 conviction for forcible oral copulation on a minor under 14 years old and was a registered sex offender. The father was 18 years old at the time of his conviction. He had a more recent conviction for failure to register. The father's two children were eight and six at the time of the petition. The father's relationship with the mother had ended several years before the filing of the petition. He no longer lived with the family; however, he still regularly visited with his two young children.

To rebut the presumption set forth in section 355.1, the father presented evidence from the mother's two older children, ages 10 and 16, who stated that the father lived with them for a substantial amount of time and had never behaved inappropriately with either of them or with his own two younger children. The father's two young children and their mother also provided evidence that he behaved appropriately around them and they felt safe in his care. (*Quentin, supra,* 230 Cal.App.4th at p. 611-612.) The father stated that he did not commit sexual abuse in 1987 and had been falsely accused. (*Id.* at p. 612.) Father also argued that the staleness of the conviction was evidence that he was not a danger to his children. He emphasized that he had not reoffended in the more than 20 years since he had been freed from custody. (*Id.* at p. 615.)

The trial court sustained the allegations against him, stating that the prior sex abuse conviction was prima facie evidence that he was a danger to his children and stating that he had "failed to present any other evidence to rebut the section 355.1

---

[6] A minute order dated 6/27/14 shows that the charge was dismissed in the furtherance of justice.

presumption." (*Quentin, supra*, 230 Cal.App.4th at p. 612, fn. omitted.) The Court of Appeal reversed, finding that the trial court erred by relying solely on the evidentiary presumption contained in section 355.1 and failing to consider the evidence in DCFS's reports that the father had cited to rebut the presumption. (*Quentin*, at pp. 620-621.)

The *Quentin* court explained that a presumption "'require[s] the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption.' [Citations.]" (*Quentin, supra*, 230 Cal.App.4th at p. 614.) The juvenile court erred in relying on the section 355.1 presumption, rather than the evidence, in asserting jurisdiction based on the father's history of sexual abuse, and the matter was remanded for consideration of all the evidence. (*Id.* at pp. 620-621.)

Significantly, the *Quentin* court acknowledged that the testimony of the father's own two children, ages six and eight, could be discounted due to their youth. (*Quentin, supra*, 230 Cal.App.4th at p. 618.) However, the court explained, "Even discounting the statements of [father's two children], who are quite young," the mother's older two children, as well as the mother, "were certainly in positions to observe [father's] conduct during the time he resided with them or visited with his children in their presence." (*Ibid*.)

Mother argues that here, like in *Quentin*, the court erroneously relied on the presumption contained in section 355.1 to sustain the allegations rather than considering contrary evidence to overcome the presumption. However, in *Quentin* the evidence was far more substantial than the evidence present in this case. Discrediting the testimony of the father's own two young children -- who were older than the child at issue here -- the *Quentin* court noted that the older siblings, as well as the mother, who was no longer in a relationship with the father, testified that the father's behavior was appropriate around the children.

Evidence sufficient to rebut a presumption must be "'"evidence sufficient to sustain a finding of the nonexistence of the presumed fact."'" (*Quentin, supra*, 230

18

Cal.App.4th at p. 614.)  In this matter, mother presented very little evidence to rebut the presumption set forth under section 355.1.  She informed the social worker that Ronald's status as a registered sex offender was a result of Ronald kissing a 14-year-old when he was 18.  This evidence does not suggest that Ronald was not a risk to the child.  In addition, mother stated that Ronald had not sexually abused the child.  However, the juvenile court was entitled to find that this evidence was not credible and therefore insufficient to defeat the presumption.  Mother was in a relationship with Ronald throughout these proceedings.  She refused to acknowledge any bad judgment on her part and refused to participate in any services.  The juvenile court was justified in determining that her statements that Ronald had never abused the child were insufficient to sustain a finding that Ronald did not present a risk of harm to the child.

Mother points out that Ronald's Maryland conviction was from 2002, over a decade prior to the filing of the petition.[7]  However, the presumption found in section 355.1 is properly triggered even when more than a decade has passed since the conviction.  (*In re John S.* (2001) 88 Cal.App.4th 1140, 1145-1146 [presumption properly applied where father's conviction under Penal Code section 288a, requiring him to register as a sex offender, had occurred 13 years before].)

Mother also attempts to rely on the child's statements.  However, the child was only five years old at the time the petition was filed.  Thus, her statements indicating that she had never been mistreated were appropriately discounted by the trial court in

---

**7**      Mother's statement that the crime in Maryland took place in 2002 is not supported by any documentation in the record.  Her estimation of the date is likely due to mother's position that the crime occurred when Ronald was 18 years old.  Because Ronald was born in 1984, he would have been 18 in 2002.  However, the records provided by DCFS show that he was convicted in the state of Maryland in 2004 for two counts of a sex offense in the third degree.  Thus, there was evidence that only 11 years had passed since Ronald's conviction.  This was far less time than the more than 20 years that had passed in the *Quentin* case.  (*Quentin, supra*, 230 Cal.App.4th at p. 615.)

19

considering whether the presumption was rebutted.[8] (*Quentin, supra*, 230 Cal.App.4th at p. 618.)

The record supports the juvenile court's determination that there was insufficient evidence in the record to rebut the presumption found in section 355.1. No error occurred.

## II. Count b-3

On August 24, 2015, DCFS filed an amended petition containing a new allegation, count b-3. Count b-3 alleged:

> "The child['s] mother . . . has demonstrated erratic, unstable and paranoid behavior as demonstrated by exposing the child to multiple unsafe and unstable home environments. Further, mother . . . has exposed the child to unsafe and inappropriate adults who at some point resided with and/or cared for the child outright. Further, the mother . . . has engaged in altercations, yelling matches and fist fights with different adults while she had care and custody over the child. Such conduct and behavior on the part of the mother endangers the child's physical and emotional health and safety and places the child at risk of physical and emotional harm and damage."

The petition was filed the same day as the adjudication hearing. Mother's counsel argued that the entire petition should be dismissed, including the new allegation. Mother's counsel argued:

> "The allegation indicates that the mother has exposed the child to unsafe and inappropriate adults. I don't know who those adults are. I don't know what inappropriate situations the department is referring to. The allegation also continues that the mother engaged in altercations, fistfights, and yelling matches with adults. Again, I don't know who those adults are. I know that there is information contained in the report, Mr. Dean, and the department does indicate that the mother does have a restraining order against Mr. Dean. So I think if that is the information the department is relying on, I don't think that is an unbiased, credible source of information. The mother is asking for the petition to be dismissed."

---

[8] We note that due to her age, the child did not provide clear answers to the social worker, and the child did not specifically answer whether she had ever been touched in a bad way.

Minor's counsel argued that count b-3 was based on mother's conflicts with the foster mother, DCFS and the social worker. Counsel for DCFS pointed out that the prior petitions filed on the child's behalf showed a pattern of mother's inappropriate conflicts with other adults. DCFS also pointed out that mother had lived in various temporary living situations where she had behaved inappropriately with other residents and staff with the child present.

The juvenile court sustained the amended allegations under count b-3 over mother's objections. The court sustained the following amended allegations:

> "The child['s] mother . . . has demonstrated erratic, unstable and paranoid behavior by exposing the child to multiple unsafe and unstable home environments. Further, the mother . . . has engaged in altercations, yelling matches and fist fights with different adults while she had care and custody over the child. Such conduct and behavior on the part of the mother endangers the child's physical and emotional health and safety and places the child at risk of harm."

Mother argues that DCFS failed to prove a risk of harm as to any of these allegations. In addition, mother argues, since the allegations are unintelligible -- providing no specifics as to time, place, or person -- they cannot be defended and violate due process.

### A. Standard of review

"In a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences. Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court. Evidence from a single witness, even a party, can be sufficient to support the trial court's findings. [Citations.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)

21

Mother's contention that the allegation was unconstitutionally vague is reviewed de novo to determine whether mother had adequate notice of the specific factual allegations against her to permit her to meet the charge. (*In re Fred J.* (1979) 89 Cal.App.3d 168, 175.)

### B. Because jurisdiction is established under counts b-2 and d-1, we need not discuss this allegation

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence. [Citations.]" (*In re Alexis E., supra*, 171 Cal.App.4th at p. 451.)

Here, we have determined that the trial court did not err in sustaining the allegations in counts b-2 and d-1 that mother created a risk to the child by causing the child to live with a registered sex offender. Jurisdiction is appropriate, and mother has failed to articulate why we should address count b-3 when we can affirm jurisdiction over the child on other grounds. Therefore, a discussion of count b-3 is unnecessary. For mother's benefit, however, we briefly address the issue.[9]

### C. The record supports the juvenile court's decision to sustain count b-3

Initially we briefly address mother's argument that DCFS failed to show a risk of harm to the child due to mother's erratic and unstable behavior and mother's history of subjecting the child to unsafe home environments.

A determination of whether a child is at substantial risk of harm should be made by looking at the totality of the circumstances, including the severity of the incidents,

---

[9]     DCFS argues that mother has forfeited this issue on appeal by failing to demurrer to the allegations and stating that she wished to proceed despite the first amended petition being filed the same day as the jurisdiction hearing. We decline to find that mother forfeited this claim. As set forth above, mother provided a specific argument that the allegations contained in count b-3 were insufficient and should be dismissed.

22

whether there was a substantial lapse of time between the instances of abuse and the filing of the section 300 petition, the amount of contact between the child and the parent, and whether the parent has adequately addressed the issues that led to the harmful conduct. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1440.)

In enacting section 300, subdivision (b), the Legislature intended to protect children who are currently being abused and "to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194-196 (*Heather A.*).)

This matter was initiated when it was reported that mother had used pepper spray in an altercation with an unknown male who was making bathroom repairs at the residence where she was staying. The juvenile court was not required to believe mother's version of the story. While mother stated that she was urinating when this unknown male walked in to the bathroom, other witnesses, including the child, did not support this version of the story. In fact, the child indicated that it was mother who damaged the restroom, and Nadia D. indicated that mother walked in on the male. In addition, while mother said she and Ronald were staying at the residence free of charge in exchange for managing the property, there was evidence that they were squatters. Dean G. and Deandra F., who identified themselves as the property managers at mother's former residence, said mother and Ronald were living in the attic for about six months and did not pay rent. The juvenile court certainly could have inferred from this information that the altercation arose from mother's problematic living situation. In addition, the court could have concluded that the child was at risk of harm from mother's violent behavior towards the unknown male.

There was also evidence that the police had been called to the residence numerous times, and that mother had written several irrational notes to property manager Dean G. Dean G. claimed mother called the police 42 times because she was angry that he was trying to evict her and each time the report was deemed unfounded. Thus, there was

ample evidence of a conflict that was escalating due to mother's decision to live on the premises without permission. The juvenile court was entitled to believe this evidence, and conclude that the tense and conflicted living situation put the child at risk of harm.

The child also provided evidence that mother and Ronald engaged in at least one violent altercation, during which Ronald and mother hit each other and mother was left with scratches on her stomach. Dean G. and Deanna F. had also witnessed violent conduct between mother and Ronald. While mother points out that domestic violence was not separately pled, this evidence, taken together with the other evidence of mother's erratic and aggressive behavior, supports a finding of risk of harm to the child. Evidence of mother's confrontations with the social worker and the foster mother adds further support for the juvenile court's determination that mother's erratic and unstable behavior created a risk of harm to the child.

The juvenile court need not wait until the child is harmed before taking action to protect them from mother's erratic and aggressive conduct. (*Heather A., supra*, 52 Cal.App.4th at pp. 194-196.) The record as a whole supported the juvenile court's determination that the children were at substantial risk of harm.

### D. *The amended petition was not unconstitutionally vague*

At the jurisdictional hearing, mother's counsel argued that the amended allegations in count b-3 were vague. In particular, the allegation regarding mother's engagement in altercations, fistfights, and yelling matches did not identify any specific dates, times, places or adults. Mother suggests that the allegations may be referring to events that are too stale to support jurisdiction. Further, mother argues, if these allegations are referring to mother's conflicts with the foster mother and the social worker, these conflicts occurred while the child was not in mother's custody, in contrast to the allegations in count b-3.[10]

---

[10] We note that mother also objected to the allegation that mother had exposed the child to unsafe and inappropriate adults, on the ground that it was unclear who those adults were. However, the juvenile court struck the language regarding the child's exposure to unsafe and inappropriate adults.

"Notice of the allegations upon which [a] deprivation of custody is predicated is fundamental to due process. [Citations.] Accordingly, a parent must be given notice of the specific factual allegations against him or her with sufficient particularity to permit him or her to properly meet the charge. [Citations.]" (*In re J. T.* (1974) 40 Cal.App.3d 633, 639.) However, several courts that have considered challenges to the sufficiency of allegations in section 300 petitions have noted that while they are not models of pleading, they are likely prepared by lay people, not lawyers. (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1153; *In re Fred J.* (1979) 89 Cal.App.3d 168, 177.)

When social workers draft petitions that do not state sufficient facts, the parent may challenge the legal sufficiency of the petition. (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1036-1037.) Here, mother made an oral challenge to the sufficiency of the pleadings, which was rejected, and the matter proceeded to a hearing on the merits. While mother continues to argue that the amended allegation provided insufficient notice, we note that at the hearing, her lawyer appeared to have a good idea of the evidence in the record supporting the amended allegation. Mother's counsel referred to the evidence provided by Dean G., and argued that such evidence should not be considered credible. In addition, the evidence that mother sprayed a man with mace and engaged in altercations with Ronald was detailed in the reports.

In sum, we find that mother had sufficient notice of the specific factual allegations against her. No due process violation occurred.

## III. Substantial evidence supports the removal order

Mother argues that there was insufficient evidence to support the juvenile court's decision to remove the child from mother's custody. Mother points out that the burden of proof at the dispositional phase is much greater than the mere preponderance of evidence required at the adjudication phase. In order to remove a child from parental care pursuant to section 361, a juvenile court must find that there is clear and convincing evidence that the child is exposed to a substantial risk of physical harm or illness. The risk of harm must be current and not a remote or isolated event. (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134.) Removal "is a last resort, to be considered only when the child

25

would be in danger if allowed to reside with the parent." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.)

Mother argues that the juvenile court erred in failing to consider a dispositional order which would allow the child to stay in mother's custody. Mother argues that the child was not a victim of serious harm and there was no evidence that she was suffering under the care that mother provided. Thus, mother contends, there was no clear and convincing evidence of detriment to the child.

A juvenile court's order removing a child from her parent's custody is reviewed for substantial evidence. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146-147.)

In the present matter, substantial evidence supports the juvenile court's decision to remove the child from mother's custody. Mother testified that she did not believe that Ronald posed a risk to the child or that it was inappropriate for the child to sleep in the same bed as Ronald. Mother remained in a relationship with Ronald and made it clear that she intended to allow Ronald to have extended contact with the child and maintain a parental role. Further, there was no indication that mother would establish a stable living situation for herself and the child. Mother made it clear that she had no intention of cooperating with DCFS. In addition, mother's prior child welfare history showed that she had a pattern of making herself and the child unavailable to DCFS during previous investigations. DCFS was justifiably concerned that mother posed a risk of flight if the child was released to her custody.

Substantial evidence supports the juvenile court's order removing the child from mother's custody.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
HOFFSTADT